1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF TEXAS

3                    MCALLEN DIVISION

4   UNITED STATES OF AMERICA      §      CASE NO. 7:08-CV-00207
                                  §      MCALLEN, TEXAS
5   VERSUS                        §
                                  §      THURSDAY,
6   1.71 ACRES OF LAND,           §      NOVEMBER 15, 2018
    MORE OR LESS, ET AL           §      10:39 A.M. TO 11:17 A.M.
7

8                    STATUS CONFERENCE

9          BEFORE THE HONORABLE RANDY CRANE
                UNITED STATES DISTRICT JUDGE
10

11

12      APPEARANCES:              SEE NEXT PAGE

13      COURT RECORDER:           RICK RODRIGUEZ

14      INTERPRETER:              ELENA MEDRANO

15

16

17

18

19

20          TRANSCRIPTION SERVICE BY:

21      JUDICIAL TRANSCRIBERS OF TEXAS, LLC
              935 ELDRIDGE ROAD, #144
22              SUGAR LAND, TEXAS 77478
         Tel: 281-277-5325 ▼ Fax: 281-277-0946
23          www.judicialtranscribers.com

24
    Proceedings recorded by electronic sound recording;
25       transcript produced by transcription service.

1                         <u>APPEARANCES</u>:

2

  FOR THE GOVERNMENT:              US ATTORNEY'S OFFICE
3                                  Richard A. Kincheloe, Esq.
                                   1000 Louisiana Street
4                                  Suite 2300
                                   Houston, Texas  77002
5                                  713-567-9422

6                                  US ATTORNEY'S OFFICE
                                   John Smith, Esq.
7                                  Megan Eyes, Esq.
                                   1701 W. US Hwy 83
8                                  Suite 600
                                   McAllen, Texas  78501

9

10   (APPEARING TELEPHONICALLY):

11

  FOR THE CITY OF ROMA:           BICKERSTAFF HEATH, ET AL
12                                 Joshua Daniel Katz, Esq.
                                   3711 S. MoPac Expwy.
13                                 Building 1
                                   Suite 300
14                                 Austin, Texas  78746
                                   512-472-8021

15

16

17

18

19

20

21

22

23

24

25

1    MCALLEN, TEXAS; THURSDAY, NOVEMBER 15, 2018; 10:39 A.M.

2        (Official interpreter utilized for translation)

3        THE COURT:  I'll just begin by calling the case

4    first, this particular case, which is 08-CV-207,

5    United States of America versus 1.71 Acres of Land in

6    Starr County, More or Less, et al.

7        For the Record, I need announcements for who's

8    here and wants to be acknowledged and certainly, if you're

9    going to speak, you need to introduce yourself as well.

10       MR. SMITH:  Your Honor, John Smith with the

11   United States.

12       MR. KINCHELOE:  Good morning, Your Honor.

13   Richard Kincheloe, also with the United States.

14       MS. EYES:  Good morning.  Megan Eyes, on behalf of

15   the United States.

16       THE COURT:  All right.

17       MR. KINCHELOE:  And that depends on which case

18   you're calling.

19       THE COURT:  Okay.  That's this case.

20       Mr. Reyes is here.  The Court will acknowledge

21   that in this -- in the 207 case, Jose Guadalupe Reyes is

22   here.

23       Is there anyone here present on the 207 case on

24   the defense side?

25       MR. KATZ:  Yes, Your Honor.  This is Josh Katz, on

1  behalf of the City of Roma, Texas, appearing telephonically.

2         THE COURT:  All right.  There are a number of

3  persons that were named and served.

4         Does the Government know why they're not here?  I

5  mean, you did provide them notice.

6         MR. SMITH:  And the Government provided notice, as

7  well, so when we got your Order, we made sure we got notice

8  out to everybody.  It's kind of par for the course for what

9  we have on border fence --

10         THE COURT:  Okay.

11         MR. SMITH:  -- and whether people show up.  Part

12  of this is a lot of Starr County is kind of on hold to see

13  where they're going to take it to.

14         THE COURT:  All right.  If at any point Mr. Reyes

15  would like to interject something, please.  He's free to do

16  so.

17         MR. REYES:  I just wanted to make sure that I was

18  able to come here and that they were also providing an

19  Interpreter and so now I'm just listening, see how things

20  go.  I definitely want to take my family and --

21         THE COURT:  Okay, great.  All right.  So the

22  Government may proceed with their presentation.

23         MR. SMITH:  Your Honor, real quick going through

24  these and then that way you can get to the specifics of each

25  case.  So this map shows us west of Roma City.  If you look

1  at the yellow down here, (indicating), that was the original

2  2008 case.  That's where they, you know --

3          THE COURT:  Uh-huh.

4          MR. SMITH:  They had the flood of 2010.  A lot of

5  this land is not here anymore.  So our take is, someplace in

6  the Gulf of Mexico.

7          So what happened was: Border Patrol had to get

8  with IBWC, the International Boundary Water Commission --

9          THE COURT:  Uh-huh.

10          MR. SMITH:  -- and come up with a new line.  And

11  so if you look at the blue up here, (indicating), Judge, as

12  we go through -- and if we can go to the next one -- so here

13  is in Roma.  You can see on the left side, it's -- northwest

14  side, it's going to divert away from the old takes -- out.

15          THE COURT:  Okay.  So this looks like I guess a

16  Google map.

17          Is that present day accurate as to the where the

18  river is?  Is this post-erosion or is this pre-erosion?

19          MR. SMITH:  This map should be -- no, I wouldn't

20  say.  This map is probably --

21          THE COURT:  Pre.

22          MR. SMITH:  -- pre-erosion because of -- we

23  already had the -- as you can see, each property line in

24  here and we identified the tract number for those property

25  lines.  So as you get to downtown Roma, you can see that the

1  alignment is going to be pretty much the same.  There's

2  other problems that we have with downtown Roma because you

3  have the cliffs of Roma, you have all those issues of can

4  you even build in that area --

5            THE COURT:  Right.

6            MR. SMITH:  -- and we're still dealing with that.

7  The only difference being for the blue, Border Patrol now

8  wants a 150-foot enforcement zone along with the fence so

9  the take might be a little bit wider.  We're waiting now.

10 We're doing survey work for that part of it.  So where you

11 have the blue, it may not be the exact same piece of

12 property that we're taking as we did in 2008 even though

13 there's the overlap that may actually extend out a little

14 bit.

15           THE COURT:  Right.

16           MR. SMITH:  And that is flexible depending on

17 whether it's possible to have a 150-foot enforcement zone or

18 whether it's even needed in that particular area.  So that

19 enforcement zone will vary from tract to tract.

20           THE COURT:  All right.  So generally 150 inside

21 the fence.

22           MR. SMITH:  150 on the river side of the fence.

23           THE COURT:  Oh, on the river side of the fence.

24           MR. SMITH:  Yeah.

25           THE COURT:  Okay.

1          MR. SMITH:  So it's an enforcement zone with --

2   the project, assuming lights and cameras, so that you can

3   see in that area anybody approaching the fence so.

4          THE COURT:  Okay.  No other requirements inside of

5   the fence on the -- opposite the river side of the fence?

6          MR. SMITH:  No.

7          THE COURT:  Okay.

8          MR. SMITH:  Generally 20 feet on that side,

9   there's usually a patrol road on that side.

10          THE COURT:  Right.  I see it.

11          MR. SMITH:  And also a road for -- a lot of times

12   because -- Rick, can you go back one, please?

13          If you go back and you see how small these tracts,

14   everybody can't have a gate and so a lot of times what you

15   do is you have a gate and then you give the adjoining

16   landowner an easement to travel along the fence to get to

17   the gate to drop -- if they have property on the river side

18   so that they can drop in and then drive back along the fence

19   and then down to their property.

20          And so that's why there's 20 feet on that one

21   side.  There will be a patrol road plus an easement road for

22   landowners that have to get to a gate to get through.

23          THE COURT:  All right.

24          MR. SMITH:  The next one.  So we go on the east

25   side of Roma and you can see it's going to divert way up

1  here, (indicating).  This part, (indicating), was the old

2  one.

3          THE COURT:  Does this particular one have an

4  erosion issue, why it was redesigned in this -- if you'll

5  back up?  Anyway from the yellow -- no, the next one.

6          MR. SMITH:  Go to the next one then.  All right.

7          THE COURT:  Yeah.  Was this -- I mean, this is a

8  big bend.  I can see where that might be an erosion issue

9  although it looks heavily vegetated.

10          MR. SMITH:  So not so much as an erosion issue on

11  this realignment.

12          THE COURT:  This was just an enforcement --

13          MR. SMITH:  This is a floodplain.

14          THE COURT:  -- in this area or it's fence?

15          MR. SMITH:  No, this is a floodplain.

16          THE COURT:  Okay.

17          MR. SMITH:  This is IBWC saying, "No, this is too

18  much in a floodplain and pursuant to the Treaty, we're not

19  supposed to divert water into Mexico."  So IBWC wanted it

20  moved away --

21          THE COURT:  Sure.

22          MR. SMITH:  -- from the river in this location --

23          THE COURT:  Okay.

24          MR. SMITH:  -- up higher ground.  So it's truly

25  based on elevation of the ground and what the floodplain is.

1           Here we go south of Rio Grande City.  You can see

2    there's a big divergent on the south side from the original

3    take.  This was -- this area was a lot of erosion right

4    here, (indicating).  So this bend in the river, we had a lot

5    of erosion and lost a lot of land that was originally in the

6    take.  So now the plain is going up higher, brings in a

7    whole different dynamic now because you had a fence near the

8    river with no land on the other side.

9           THE COURT:  Sure.  Right.

10          MR. SMITH:  Now you've got landowners that are

11   going to possibly have a fence up higher with more land on

12   the river side.

13          THE COURT:  And this is proposed, but yet unfunded

14   or is this for taking?  I mean, I know you all are doing

15   survey work now but --

16          MR. SMITH:  Right.

17          THE COURT:  -- what's the --

18          MR. SMITH:  So here's where we get to on --

19          THE COURT:  Okay.

20          MR. SMITH:  -- that section of it.  What we know,

21   based on funding that we got for 2018, we have 25 miles in

22   Hidalgo County.  That's pretty easy.  That's all the rest of

23   Hidalgo County except for Santa Ana.  Santa Ana was

24   specifically excluded in the funding part of that.  So the

25   other 25 miles will fill in everything in Hidalgo County

1   that was not done back in 2008.

2           THE COURT:  Okay.

3           MR. SMITH:  Twelve miles some place in Starr

4   County.  I can't -- long ago with Judge Hanen I stopped

5   making promises because this thing has gone back and forth

6   and I would tell him something and then I'd have to come

7   back and tell him, "Judge, you know, that's not right, this

8   has changed."

9           And so I can't tell anybody in this room right now

10  where that 12 miles for sure will be.  They're doing the

11  surveys.  They're going to determine where they need it and

12  where they can build it and there will be 12 miles someplace

13  in Starr County, and so part of my problem.

14          THE COURT:  Okay.

15          MR. SMITH:  So as we can see in Rio Grande City,

16  it stays pretty much the same as it was except for the

17  enforcement zone.  And then when you get southeast, same

18  thing.  It's diverting way away.  We're going to go back up

19  here, (indicating), out of the floodplain.  And so you had

20  that issue.

21          And one second.  And then this is the very far end

22  of Rio Grande City.  I can't really read -- but is

23  Mr. Guerra here?

24          Mr. Guerra?

25          MR. GUERRA:  David Guerra.

1          THE COURT:  All right.

2          MR. SMITH:  David Guerra has some property out on

3     this end, (indicating), and we've gone, you know --

4     unfortunately for him, we've gone back and forth because

5     originally it was down here, (indicating), and then we found

6     out, okay, they're going to move this.  And what happened

7     early on was, okay, we've come up with a new plan, we're

8     going to move it.  And then there was a thought, well, we're

9     not going to get funding to be able to build.

10          THE COURT:  Right.

11          MR. SMITH:  So then what do we do?  So we actually

12     talked with Mr. Guerra about possibly reverting property

13     back to him.  Well, then the funding came so, okay, now we

14     are going to build again.

15          And so with a lot of these landowners we just

16     said, "You know, it's up to you, but we'd like to put this

17     on hold because I don't want to deal with this part for you

18     and then have to come back and take even more land.  I'd

19     rather just do an amended declaration of taking if I'm

20     taking two different sections for you."

21          If you go back one for me to Roma.  So for

22     instance, Judge, this is one's a perfect one.

23          Rick, whose property is that?  Which -- who's the

24     landowner?

25          MR. KINCHELOE:  Mr. De Leron (phonetic).

1        MR. SMITH:  De Leron.  So this property was

2   originally here, (indicating), and then they're coming back

3   and what they were going to end up doing is really

4   dissecting his property.  And so recently, we had the

5   discussion with him because they also are doing the take

6   right here, (indicating), for a boat ramp, so it's really

7   cutting up his property.

8        So now we've gotten in the negotiations and what

9   we're thinking is: why don't we just -- he wants us to --

10  "Just take my whole property."  And then you put the whole

11  property in this area.  So those are some of the issues that

12  we're going through --

13       THE COURT:  Uh-huh.

14       MR. SMITH:  -- because of the divergent pass now

15  for the fence from the old take to the new take.

16       THE COURT:  Okay.  You say, "New take," but --

17       MR. SMITH:  We haven't done a new take yet.

18       THE COURT:  Okay.

19       MR. SMITH:  Yeah.  So new take would be --

20       THE COURT:  So that's going to be one of the big

21  issues here today is --

22       MR. SMITH:  Right.  And so that's that

23  terminology.  I'm now talking -- sometimes we call it "lazy

24  take," sometimes we call it "old take," but what I'm talking

25  about is the 2008, 335 cases that we filed all at one time

1   and did that so.

2          THE COURT:  Right, 14 of which are here today on

3   the Docket.

4          MR. SMITH:  Exactly.

5          THE COURT:  More or Less.

6          MR. SMITH:  Then this is Los Ebanos.  And much of

7   Los Ebanos is actually going to be the same, except for --

8   you can see there's not much divergence around Los Ebanos.

9   And so we've dealt with a lot of those cases and actually

10  closed a lot of those cases in Los Ebanos.

11         Do we have this section up here on the next one?

12  One more.  Okay.  The one area that we're going to have some

13  issues with is this section right here, (indicating).  Even

14  though they put that as the new take line, there may be some

15  problems of actually being able to build a fence in that

16  area.

17         THE COURT:  It's too close to the river?

18         MR. SMITH:  Too close to the river.  There was

19  some erosion issues here as well.  And so this may or may

20  not have to change.  I just can't tell anybody at this point

21  until they get done with the new survey work, the new ROEs

22  that we're dealing with.

23         THE COURT:  I mean, where else would you put it?

24  You've got a road running parallel to it right there,

25  (indicating).

1           MR. SMITH:  Right there, (indicating), is a road.

2   This is a really high cliff though and it's a very soft

3   cliff so the erosion hits pretty well.  So a lot of this

4   eroded away because any place you had in the river where

5   there was a harsh bend like this, (indicating), a horseshoe

6   bend --

7           THE COURT:  Uh-huh.

8           MR. SMITH:  -- in 2010 had a lot of erosion on the

9   outside of that horseshoe.

10           THE COURT:  Are there any homes in this area?

11           MR. SMITH:  There are a few homes in this area.

12   That's another problem as you get up into here, are we going

13   to end up being too close to a home or through a home?  We

14   don't like to do Relocation Act basis --

15           THE COURT:  Yeah, for the other side of the home.

16           MR. SMITH:  -- so we try to stay away from not

17   doing that.  So those are all issues.

18           There were some older buildings in here.  There

19   was a Mennonite group at one time that had a church-owned

20   kind of group, but that's been abandoned.  And then the rest

21   of this is pretty open.  But there are a few houses right on

22   that area right there, (indicating).  That's your -- the

23   Starr County project.  That's just kind of the overview

24   so -- into this case.

25           THE COURT:  Okay.  So what my goal is today is to

1   figure out what I can get rid of, what we can close, what

2   cases are very close to being resolved, and then deciding

3   which cases to keep open.

4          My thinking before taking the Bench here today is

5   that because I don't have any -- none of us can predict --

6   have any confidence to know whether there's going to be

7   actual funding for this project in 2019 that's -- I'm going

8   to treat this as this is it, this is all there is, and I

9   don't want to keep open cases that might get funded in the

10  future.

11         And so then we're going to -- I just don't want to

12  sit here in 2019, "Oh, we don't get this year but we're

13  going to get it next year."  We probably have to wait till

14  after the elections.  And if it goes one way, then you'll

15  get -- I don't want to engage in that.

16         These are 10-year-old cases.  I want -- what I

17  want to do is say let's get rid of it.  Let's resolve what

18  we can now and leave for another day a new action against

19  the then current title holders, start fresh with whatever

20  taking you all decide to do at that time.

21         So to the extent you can --

22         MR. SMITH:  Your Honor --

23         THE COURT:  -- you all are abandoning prior taking

24  attempts, you'll want wrap those things up, those cases up.

25  Tell me what's wrong with that sort of plan.

1          MR. SMITH:  Actually there's nothing wrong with

2    that sort of plan, Your Honor.  So to give you a head's up,

3    the Army Corp has started what they call the "2019 ROE

4    Letters."

5          THE COURT:  Okay.  Uh-huh.

6          MR. SMITH:  I think Judge Hinojosa got one of the

7    2019 ROE Letters, so that's going even farther out from

8    Roma.

9          THE COURT:  The other side, yeah.

10          MR. SMITH:  It'll be more Starr County will be in

11    those 2019, but we don't know on the funding on that, you

12    know, so I'm not making any plans.  I know we're starting

13    the ROEs and we're doing that process, but we don't have

14    funding to actually build fence for those and so that's

15    not -- the only suggestion that I would make is we are very

16    close so the construction Contract has been vetted now, it's

17    been bid, so they're going to start on some of these

18    construction areas.  And so if by February, we should have

19    an idea of where in Starr County --

20          THE COURT:  The 12 miles is going to be.

21          MR. SMITH:  -- they're looking at building.  That

22    will help us with all these landowners.  Because then I can

23    say, "Okay.  Yeah, we're going to get it here."

24          Part of what the Army Corp and Border Patrol has

25    said is, "Okay.  Even with the new alignment, the old takes

1    to the extent they exist," because in the original taking it

2    was for fence or roads to assist in the --

3            THE COURT:  Uh-huh.

4            MR. SMITH:  So they may keep those as roads.

5    Those are all issues they're trying to figure out, but they

6    don't know that answer until they know where they're going

7    to build that 12 miles in Starr County.

8            And so I agree with you, I think we can start

9    pushing these cases to closing.  Once we have that answer of

10   "Okay.  Where are you building 12 miles in Starr County on

11   this contract that you're letting?" because once they let

12   that Contract out and they have those areas, then we can

13   say, "Okay.  Now we know what we need to do."  And the rest

14   of them, even if they're not getting built on, we can at

15   least close their old cases.

16           THE COURT:  So you said the Contracts have already

17   been bid and they're going through a vetting process so --

18           MR. SMITH:  So it's a design built contract --

19           THE COURT:  Right.

20           MR. SMITH:  -- so they have to do the design work

21   for the fence --

22           THE COURT:  Okay.

23           MR. SMITH:  -- and then they have to build the

24   fence as well.  And so they're doing the -- and they have to

25   do the survey work that we got all the ROEs for that we're

1   doing right now, the 2018 ROEs that we've been doing in

2   Hidalgo and Starr County.

3             THE COURT:  Uh-huh.

4             MR. SMITH:  For the Court's awareness, that's gone

5   really well.  We changed things, up based on what Judge

6   Hanen had us do in 2008, which was -- I decided for DOJ if

7   the Army Corp and Border Patrol couldn't get an ROE --

8   before we just went and filed a DT.  We were actually going

9   to go negotiate with the landowner, too, because Judge Hanen

10  had us go back out after we filed a DT.

11            THE COURT:  And meet.

12            MR. SMITH:  And so I thought you might as well do

13  that at the get-go and then that way everybody knows when we

14  come in here we've done everything we -- that at least

15  Judge Hanen at that time would have wanted us to do.

16            THE COURT:  Uh-huh.

17            MR. SMITH:  It's actually had a very good success.

18  We don't have nearly as many ROE -- DTs filed in the courts

19  that we thought we were going to have.

20            THE COURT:  Yeah, I mean --

21            MR. SMITH:  It's been very --

22            THE COURT:  -- hardly any.

23            MR. SMITH:  I'm going to say about 80 percent

24  signed on the ROE.

25            THE COURT:  Uh-huh.

1          MR. SMITH:  So that part worked out really well.

2   We've been working behind the scenes trying to get -- make

3   sure that all those cases went through and we're dealing

4   with everybody on those.  I think the first one we have come

5   up due would be the --

6          THE COURT:  So back to my point that I wanted to

7   make with my question.  If the Contracts for the design and

8   builds are being vetted, the bids have already come in and I

9   guess they're reviewing them, necessarily don't we know

10  where the 12 miles are?  I mean, because I would imagine the

11  bids would be substantially different depending on the

12  terrain, access to it, whether it's on a cliff, whether you

13  bring in fill dirt in a lot of areas because there's low

14  spots.

15         I mean, don't we already know in order to have

16  that bid?

17          MR. SMITH:  Okay.  So the reason why I'm going to

18  say, "No," is because the way Congress appropriated the

19  money.  They appropriated a certain amount of money for

20  building in Hidalgo County, a certain amount of money --

21          THE COURT:  Uh-huh.

22          MR. SMITH:  -- for building -- you know, they did

23  do that, this amount of money to build here.  Hidalgo County

24  is going to have concrete like it did before for lesser

25  points.

1          THE COURT:  Sure.

2          MR. SMITH:  There's one place where the -- over

3  by old Hidalgo where the lake is there --

4          THE COURT:  Uh-huh.

5          MR. SMITH:  -- that will actually have a bollard

6  fence on the other side of the lake there.  That's the

7  current design.  But most places will be concrete, whereas

8  Starr County will be the what we call the "Cameron County

9  bollard design."

10          THE COURT:  Uh-huh.

11          MR. SMITH:  So it'd be that different.  I think

12  what they have to wait for from Border Patrol in the course

13  is once they get all those bids in, okay, this is how much

14  we're bidding to build this, do we have that amount of money

15  to build 25 miles in Hidalgo County.  The bids may come in

16  where they don't have enough money to build 25 miles and

17  maybe less.

18          THE COURT:  Okay.

19          MR. SMITH:  Same thing for Starr County, they may

20  not have the money to build 12 miles in Starr County, maybe

21  less or, you know, if it comes in cheaper, it may be more.

22  But that's the -- that's why I'm waiting on, "Okay.  Tell me

23  where you're building based on these bids.  You've got the

24  money.

25          THE COURT:  So the bids aren't location specific,

1  they're sort of like, well, any 12 miles you all pick in

2  Starr County, here's my bid"?

3             MR. SMITH:  No.

4             THE COURT:  It seems a little right.  That seems

5  to be --

6             MR. SMITH:  No.

7             THE COURT:  So how does somebody bid without

8  knowing where exactly they're going to be building this

9  structure?

10             MR. SMITH:  So contrary to the 2008 where I had

11  one contractor building, there's multiple contractors

12  bidding on different sections.

13             THE COURT:  Sure.

14             MR. SMITH:  So you get that bid in for each of

15  those sections.  Same thing in Starr County, getting those

16  bids in for those sections.  And then it's like, "Okay.

17  Here's what we can build."  We may not be able to take --

18  okay.  That one's out, this one's in.  That's what I'm

19  dealing with.

20             THE COURT:  Okay.  But did they bid more than

21  12 miles in Starr County?

22             MR. SMITH:  No, but if the bids come in under and

23  they decide, "Okay.  Then we've got more land here, we can"

24  -- because we've done more than 12 --

25             THE COURT:  But at least we've defined the

1   "12 miles" though.

2           MR. SMITH:  Right.

3           THE COURT:  Okay.

4           MR. SMITH:  That's what I'm saying.  By February,

5   I should know the 12 miles.

6           THE COURT:  No.  But you should know now what

7   they are.  You know at least what they bid for, the 12 miles

8   that were bid upon, that they may build less than that.

9   They may then have extra money to build more than that.  But

10  we at least know the first 12 miles that will be constructed

11  because that's what was bid.  And again talking Starr

12  County.

13          MR. SMITH:  So, okay, from that standpoint, my

14  understanding is the bid is more than 12 miles.  They're

15  going to pick the 12 miles they can bid.

16          THE COURT:  Okay.  That was my question.

17          MR. SMITH:  So you've got multiple spots in --

18          THE COURT:  So they may have bid 20 miles --

19          MR. SMITH:  Exactly.

20          THE COURT:  -- and you're going to pick 12.

21          MR. SMITH:  That's my understanding.  And I can

22  get more details about that.  I haven't really -- you know,

23  it's not really my purviews.  I don't want to get into the

24  weeds on the bidding side.

25          THE COURT:  Well, I understand that.


                    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1           MR. SMITH:  Right.

2           THE COURT:  But if we drill down deep enough,

3  what we -- I was trying -- I was hoping that we could figure

4  out where the 12 miles are.  I mean, it's some committee

5  being -- or some agency being reviewed because they had to

6  know where they were going to be constructing or if the

7  company to them bid on that project.  Your surmising is --

8           MR. SMITH:  If you look at where we --

9           THE COURT:  -- that they probably bid on 20 miles

10 or 18 miles?

11          MR. SMITH:  Correct, Your Honor, because we did

12 ROEs for more than 12 miles --

13          THE COURT:  Uh-huh.

14          MR. SMITH:  -- right of entry, to do all of this

15 and so I don't think --

16          THE COURT:  Is that because you had funding to do

17 those ROEs?

18          MR. SMITH:  The ROEs?

19          THE COURT:  Uh-huh.

20          MR. SMITH:  We had funding to do the ROEs.

21 That's a different pot of money --

22          THE COURT:  Yeah, I see.

23          MR. SMITH:  -- than the part of it that they had.

24 Plus the ROEs -- the survey work is the expense there

25 though.

1          THE COURT:  Uh-huh.

2          MR. SMITH:  It's just going out and doing the

3   survey and the soil testing to see if it's -- there are

4   other issues that you have and like is it even possible to

5   build downtown Roma.

6          THE COURT:  Uh-huh.

7          MR. SMITH:  So does that bid -- I mean, when they

8   come and do that bid, this is what it would take along the

9   cliffs of Roma to build.  That may just knock that whole

10  section out.

11         THE COURT:  Yeah.  I mean, there's a big gap in

12  the cliffs and how do you cross that.

13         MR. SMITH:  Exactly.

14         THE COURT:  And there's a --

15         MR. SMITH:  Starr County has a lot of --

16         THE COURT:  -- wildlife sanctuary there.

17         MR. SMITH:  Starr County has a lot of gullies and

18  washouts that --

19         THE COURT:  Uh-huh.

20         MR. SMITH:  -- we don't have in Hidalgo County

21  and Cameron County so those are some new issues that we're

22  dealing with.  So that's why I don't feel confident telling

23  the Court at this point I know where 12 miles is going to be

24  built.  And I know in Hidalgo County what the possible 25

25  miles is because it's everything in Hidalgo County.  I can't

1   tell you for sure all 25 miles is going to get built --

2               THE COURT:  Uh-huh.

3               MR. SMITH:  -- because it depends on the dollar

4   amount for that build.  But for Starr County, I don't even

5   have that confidence to say, "Oh, yeah, I know this section

6   is going to get built," until they actually come back with

7   those contracts.

8               THE COURT:  And we'll know that we hope February.

9               MR. SMITH:  Yeah, we should have that by

10  February.

11              THE COURT:  That'll help eliminate some cases at

12  that point that may still be pending.

13              MR. SMITH:  It will help eliminate cases.  It

14  will help us negotiate with the landowner, "Okay.  Here's

15  what" --

16              THE COURT:  Yeah.

17              MR. SMITH:  -- "you have.  How do you want to

18  proceed with this?"

19              THE COURT:  Sure.  I mean, likely will create new

20  cases.  Okay.  So let's just -- so can we just sort of start

21  picking off each case then and let's see --

22              MR. SMITH:  Sure.

23              THE COURT:  -- what we can do with it?  And

24  again, I'm going to start first with the case involving

25  Mr. Reyes and the City of Roma, which is that 08-CV-207

1  case.  Based on your submission on the status, this is one

2  of erosion issues, determining what additional land need to

3  be taken.

4          MR. KINCHELOE:  Yes, Your Honor, that's right.  I

5  don't know that the erosion issues on this one are going to

6  be as serious as some others, but there -- we are trying to

7  figure out how much of this land is still there.

8          THE COURT:  Again, so this is now speculating as

9  to land that might be taken with funding for fence fiscal

10 2019.

11         MR. KINCHELOE:  Yes, Your Honor.

12         THE COURT:  And this is on the map of where the

13 fence will be constructed, but we, at this point, have no

14 idea whether it will actually be constructed there because

15 we don't have the funding information, I guess.

16         MR. SMITH:  Well, one correction, not fiscal -- I

17 always get my fiscal years -- so last 2018 money that we do

18 have, that would be part of this.  This plays into that

19 12 miles that we're trying to do.

20         THE COURT:  Okay.

21         MR. SMITH:  For me when you say, "Fiscal 2019,"

22 we're trying to get --

23         THE COURT:  No.  Okay.

24         MR. SMITH:  -- funding or even more money --

25         THE COURT:  Yeah, yeah, that's a few -- yeah, for

1  even more.

2           MR. SMITH:  Okay.

3           THE COURT:  So the 12 miles is 2018 funding.

4           MR. SMITH:  Correct.

5           THE COURT:  We still don't know where it's going

6  to be.

7           MR. KINCHELOE:  Exactly.

8           THE COURT:  Okay.  So this is a piece of land

9  that is on the map for a fence crossing it.

10          MR. KINCHELOE:  Yes, Your Honor.

11          THE COURT:  We don't -- we won't know until

12  February where actually that will happen, so the issue then

13  is figuring out whether you're going to proceed forward with

14  this or not?  I mean, if they're not going to build it

15  there, you dismiss the claim and move on?

16          MR. KINCHELOE:  No, Your Honor.

17          THE COURT:  I mean, what's the plan on this one?

18          MR. KINCHELOE:  If we don't build at this

19  location, even if the land is already washed out, we have to

20  pay just compensation for what we took and that does

21  compensation of the value of the land as of the date we took

22  it.  So we take it and then two years later it all erodes

23  out, we've still got to pay for it and that's on us.

24          THE COURT:  Right.  So you took the land in '08

25  or thereabouts, so you may take more, --

1          MR. KINCHELOE:  Right.

2          THE COURT:  -- but you had to pay for what you

3    took.

4          MR. KINCHELOE:  Right.

5          THE COURT:  Is there a possibility -- maybe not

6    in this case, but in other cases where you would actually

7    say, "We don't need the land you took.  You can have it

8    back" or that -- that's some part of the calculus is "We'll

9    give you back some land and it's worth a certain value"?

10         MR. SMITH:  Yes, Your Honor.  And that's part of

11   what we're waiting on to see where they're actually going to

12   build especially if there's going to be a 2018 build of

13   12 miles, for instance, and 2019 there's no money, then from

14   my standpoint, okay, I've got more definition there and I

15   know how to deal with everybody.

16         For instance, for Mr. Guerra, we've had

17   conversations with him early on.  We were thinking, "Okay.

18   Let's revest the property to him," and then Border Patrol

19   changed their mind and said, "No, we may want this for a

20   road."  But then his is so far down on the southeast side so

21   we're not sure.  And so that is always a possibility.  The

22   revestment of those lands is always a possibility.  I just

23   can't tell a landowner at this point, "Yes, we can."

24         THE COURT:  Yes.  And we also have landowners

25   say, "Good riddance.  That was junk land, I don't want it

1  back.  I'm not going to pay you for it."

2          MR. SMITH:  Yeah.  And then that's fine.  Then we

3  pay the fair market value.

4          THE COURT:  Okay.  So we need to figure out that

5  this is a valuation?  That's why this hasn't been resolved

6  is valuation issue?

7          MR. KINCHELOE:  Valuation and ownership.  A lot

8  of the land in this area, title just is not as clear as we

9  would like.

10          THE COURT:  And you continue your -- see, I have

11  no patience for claims that we don't know who owns this.

12  It's been 10 years.

13          MR. KINCHELOE:  Yes, Your Honor.  Part of the

14  problem is not we don't know who owns in terms of the record

15  title owner, it's somebody died and somebody else died

16  intestate, and so we're going to have to publish notice

17  because we just can't find all the owners.

18          THE COURT:  And why haven't we in 10 years?  And

19  that's what I don't understand about these cases.  It's been

20  10 years.

21          MR. SMITH:  So for Starr --

22          THE COURT:  Please.

23          MR. SMITH:  I understand.  For Starr County,

24  when -- well for all the project in 2008 when it was filed,

25  they did not come to the US Attorney's Office with any title

1  work and survey records, so it was all done after the fact

2  and we did a lot of the title survey work.

3          Starr County, we didn't get title work until

4  approximately two years ago.  Number one, they couldn't find

5  anybody to do title work for the United States Government,

6  Starr County.  And then once they did, we had problems with

7  the land plan.  Then we got past that.  And now we're up and

8  running and we're getting the title work.  But it has

9  actually not even started coming into the US Attorney's

10  Office for the actual title work until approximately two

11  years ago, two or three years ago.

12          THE COURT:  All right.  So you have title work on

13  this particular land and -- but we haven't provided these

14  owners with notice of this suit or, I mean, what do we need

15  to do to wrap this up?

16          MR. KINCHELOE:  We've provided --

17          THE COURT:  This seems like an easy one.

18          MR. KINCHELOE:  Yes, Your Honor.  We've provided

19  written notice to the addresses we have.  The next step is

20  we need to publish notice to the owners we can't find, the

21  unknown heirs.  What we've tried to do is consolidate

22  publications with as many cases as is reasonable to keep it

23  economical because it's --

24          THE COURT:  Have you noticed any of them?  I

25  mean, in the past six months, have you provided any

1    notice -- or a year -- on any of these cases that are still

2    pending?

3              MR. KINCHELOE:  Publication notice?

4              THE COURT:  Yes.

5              MR. KINCHELOE:  No, Your Honor.

6              THE COURT:  Okay.  But your plan is --

7              MR. KINCHELOE:  Not in Starr County.  We have in

8    Cameron County.

9              THE COURT:  Okay.  Yeah.  We're talking about

10   just these cases.  So your plan is then to try and publish

11   notice in a fashion where you can tackle many or all of

12   these cases at one time, "These are the tracts of land or

13   whatever you claim an interest in, notice," whatever,

14   "contact us in so many weeks."

15             How quickly do you think that can reasonably be

16   accomplished?

17             MR. SMITH:  So for publication, we can probably

18   start doing publications sometime after the first of the

19   year.  When we try to do these like, for instance, in

20   Cameron County, we've done two publications in Cameron

21   County.  It cost us about 200,000 just because of the size

22   of these things that we have to publish and we have one

23   paper that owns both -- or one person -- corporation owns

24   both papers, so we don't -- can't really negotiate.

25             So it's a large expenditure so we try to do them

1    all and get them all in there.  And so that's what we would

2    -- again, it comes down to, okay, once we realize where

3    we're building and who we're dealing with.

4            But even if it's a revestment, I still need to do

5    the publication because we can't revest the land until we

6    actually have done everything for the title work and made

7    sure we gave notice to potential owners because I can't

8    revest it, if I don't know exactly who the owner is.

9            THE COURT:  Okay.  So in this case, the --

10   involving Mr. Reyes, we're going to publish notice.  You

11   think you can do that after the first of the year so I'm

12   going to give you 60 days to do that.  I mean, if some issue

13   comes up, I mean, you can revisit this, but I want to get

14   these cases moving so I'm going to push you.

15           So 60 days or that you publish notice to anyone

16   who claims an interest in this property within two months.

17           What else can you do in this case in the interim?

18   It's hard to negotiate anything or resolve anything until

19   you get that notice out.

20           MR. KINCHELOE:  Yes, Your Honor.  We've done a

21   couple of these in Cameron County where we are well along

22   the process of handling cases where we can't find the

23   owners.  What we've done is we've published notice.  After

24   we published notice and given time to respond, we have filed

25   a motion asking the Court to enter a default under 55(a).

1          THE COURT:  Sure.  Right.  I intend to do that.

2          MR. KINCHELOE:  We didn't -- just we'd rather go

3  through the Court and the Clerk's Office because we want to

4  make sure everybody knows what's going on.

5          After the Court enters a default, then we ask the

6  Court to set a trial date.  If we can get some owners to

7  give us some unsworn declaration about what the value is, we

8  use that as evidence.

9          But if we can't find any owners and no one will

10  talk to us, as is the case in one case in Cameron County,

11  we're going to have to go get an in-house appraisal and then

12  bring our own appraiser in.

13          THE COURT:  Okay.  Just using what's on the

14  County's Appraisal District isn't sufficient to be -- you

15  don't have anybody showing up on the defense side.  All you

16  need is some evidence to present to the Court in your Bench

17  Trial.  I mean, it wouldn't even be a trial.  It would be

18  just a default judgment, evidentiary hearing on a default

19  judgment.  It's the value of the property.

20          MR. SMITH:  So when I got involved in this, new

21  to my world of condemnation and I thought the same things.

22          THE COURT:  That's --

23          MR. SMITH:  Pursuant to the Uniform Act, we still

24  have a duty because even if the landowners don't show up, we

25  have to pay that money into the Registry of the Court and it

1  has to be based on what we call the "yellow book," which is

2  the federal guidelines for appraisal work on compensation.

3  So we actually have to give the Court some kind of evidence

4  to make a just compensation ruling.

5          We can do that if there's landowners and they

6  agree, "Hey, this is the value of the land."

7          THE COURT:  Sure.  Yeah.

8          MR. SMITH:  We can do it and then we can pay that

9  in.  And any unknown owners, that share goes into the court.

10         THE COURT:  Sure.

11         MR. SMITH:  But we have a number of these cases

12  where we can't find owners or the heirs and so we just have

13  to have like a little mini trial.  Again, we've got somebody

14  working now in-house that can do the yellow book appraisers

15  that's not our normal expert that we use in litigating a

16  case.

17         THE COURT:  Uh-huh.

18         MR. SMITH:  But they can do a -- and what we're

19  trying to get them to do, not only here, but in Cameron

20  County, is to look a number of these so that they can do one

21  report for a number of them --

22         THE COURT:  Uh-huh.

23         MR. SMITH:  -- and so we don't have to have a

24  report for each and every one, and so we can get similar

25  properties.  Then we can come to the Court with that.

1           THE COURT:  Okay.  So that's -- there is no

2  less-involved method.  You're going to have to have this

3  yellow book appraisal from an expert.  You can -- there's no

4  other way.

5           MR. SMITH:  Yes, Your Honor, we've gone back and

6  forth with the Court and DOJ, LAS on there's got to be an

7  easier way and --

8           THE COURT:  Is the county doing its --

9           MR. SMITH:  -- this is what we're going to have

10  to do.

11           THE COURT:  I mean, the Appraisal District -- I

12  mean, they have their own process.  I mean, that value

13  that's in the books that people are paying taxes on, that's

14  not enough evidence?

15           MR. SMITH:  Well, if you look at what it takes to

16  do a yellow book appraisal, it's not like anything that we

17  see from appraisal districts or even from just home

18  appraisals for buying a house.  Very complicated on that

19  side.  I would love to be able to do that.

20           THE COURT:  Yeah.  It would make things a lot

21  quicker and easier.

22           MR. SMITH:  Yes, exactly.

23           THE COURT:  All right.  So then on this one,

24  we'll publish notice.  We'll wait until the response period

25  ends.  I'm sort of feeling that maybe at that point we

1    should have a hearing on what we do next, but likely we

2    would proceed with a request to default the non-responding

3    people that you have -- you know, may own this, have an

4    interest in this.  We do have some people who could maybe

5    agree on an amount.

6              If not, then we just set it for a trial and

7    valuation?

8              MR. KINCHELOE:  Yes, Your Honor.  And the 60 days

9    -- well, I guess 60-days-plus response time --

10             THE COURT:  Right.

11             MR. KINCHELOE:  -- we'll reach out to the owners

12   we can find and see if we can get new agreements about the

13   value of just compensation.  If we can, then we can present

14   that evidence and shortcut the --

15             THE COURT:  Yeah.  I mean, this was an easy one.

16   We have the City of Roma.  I'm pretty sure they can probably

17   come up with something.  I guess Mr. Reyes is coming in,

18   maybe a few other parties and -- have an interest.

19             All right.  So what is the typical response

20   period that people are given in the Notice, two weeks,

21   30 days?

22             MR. KINCHELOE:  I think it's 30 days, Your Honor,

23   but I don't have the rule in front of me.

24             THE COURT:  You think 30 days?

25             MR. SMITH:  Your Honor, I think we have to

1  publish --

2          THE COURT:  It's maybe a little bit more?

3          MR. SMITH:  -- for three weeks straight the

4  publication notice, so I think it's three weeks and two or

5  three days maybe that we do the publication.

6          THE COURT:  I'm trying to get this resolved

7  before March 31, for obvious reasons, but I'm -- we're going

8  to have difficulty doing that because even if we publish

9  notice the first of January, basically we're going to lose

10 January to the response period.  So I could set this for a

11 hearing the first of February, if it were to go from there.

12          Why don't we do that?  Again, this may be a

13 similar pattern on the other cases as well.

14          All right.  So again, I've already made my Order

15 on the Notices to be published within the next 60 days and

16 then I'll set this for a Status Conference early February

17 determining what to do next on this case.  Okay.

18          So we're done with that one case.  Hope you were

19 taking good notes.

20      (Hearing adjourned at 11:17 a.m.)

21

22

23

24

25                        * * * * *

1         *I certify that the foregoing is a correct*

2  *transcript to the best of my ability produced from the*

3  *electronic sound recording of the proceedings in the above-*

4  *entitled matter.*

5  */S/ MARY D. HENRY*

6  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

7  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

8  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

9  *JTT TRANSCRIPT #59856*

10 *DATE FILED:  JANUARY 31, 2019*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25